**In re EAGLE–PICHER INDUSTRIES, INC. et al., Debtors.**

**Eagle–Picher Industries, Inc. et al., Movant,**

v.

**Caradon Doors and Windows, Inc., Respondent.**

**No. 91–00100.**

United States Bankruptcy Court, S.D. Ohio, Western Division.

May 9, 2002.

---

Christopher H. Buckley, Jr., Gibson Dunn & Crutcher, LLP, Washington, D.C., Audrey S. Trundle, Gibson Dunn & Crutcher, LLP, New York, NY, John L. Taylor, Jr., Celeste McCollough, Chorey Taylor & Feil, PC, Atlanta, GA, Henry E. Menninger, Jr., Wood & Lamping, LLP, Cincinnati, OH, Stephen Karotkin, Weil Gotshal & Manges, LLP, New York, NY, Debra Dandeneau, Weil Gotshal & Manges, LLP, Miami, FL, Matthew J. Calvert, Hunton & Williams, Atlanta, GA, Douglas S. Tripp, Frost & Jacobs, LLP, Cincinnati, OH, Neal Weill, Asst. U.S. Trustee, Cincinnati, OH.

## DECISION AFTER REMAND

BURTON PERLMAN, Bankruptcy Judge.

For background to this Decision, we quote from our prior Decision and Order on Debtors' Motion for Summary Judgment filed April 5, 2001:

For orientation we begin this decision by repeating the opening paragraph of our original decision, that entered December 24, 1997, in this matter:

Reorganized debtor Eagle–Picher Industries, Inc. ("EPI") has filed a Motion for Order Enforcing the Plan and the Confirmation Order to Stay Actions of Caradon Doors and Windows, Inc. (the "Motion"). Caradon was held liable for patent infringement in a suit by Therma–Tru Corporation. The subject of the patent in question was fiberglass skins. Such fiberglass skins had been sold by EPI's predecessor. (That predecessor was the pre-confirmation debtor Eagle–Picher Industries, Inc. in the captioned bankruptcy case. Hereafter, the term "debtor" will be used to refer to that entity.) Caradon has now filed suit against EPI in a Georgia U.S. District Court (the "Georgia suit") seeking damages on a number of theories. Caradon states that it limits its claim for damages to post-petition (i.e., post-January 7, 1991) damages.

In our prior decision, this court granted the motion of EPI. We did so on alternative bases: (1) that Caradon had abandoned its claim, and (2) that Caradon was an "unknown" creditor, that therefore notice by publication was sufficient for Caradon to be bound by the order of confirmation entered in the consolidated Chapter 11 bankruptcy cases captioned above, and therefore the suit filed by Caradon against EPI in a Geor-gia U.S. District Court violated the Plan and confirmation order entered in these consolidated cases, as well as 11 U.S.C. § 524(a) and § 1141(a), (c), and (d)(1)(A). Caradon then appealed from the decision of this court to the U.S. District Court. The District Court reversed this court in its conclusion as to abandonment, but remanded the case for further findings as to whether Caradon was a "known" or "unknown" creditor.

\* \* \* \* \* \*

Following the remand, this court convened a status conference on July 27, 1999 for the purpose of scheduling discovery regarding the issue identified by the District Court. In the course of discovery, EPI came upon evidence which it asserted showed that Caradon had actual knowledge of the confirmation hearing prior to that event, and contended that if that were true, a determination of the "known"/"unknown" issue would be mooted. EPI moved to limit discovery to that issue, and that motion was granted. Subsequently, at the request of Caradon, discovery was broadened to include the issues of whether Caradon's claims in the Georgia Action were pre-petition or post-petition, and, if post-petition, whether such claims were administrative in nature.

We add to the foregoing that in its remand the District Court said, in the event that it was found that Caradon's claims arose post-petition, that this court "may be required to determine whether the claims relate to administrative expenses and, if so, whether they are dischargeable."

In addition, the foregoing statements require emendation in one respect in view of uncontested facts appearing in the Joint Pretrial Statement filed by the parties.

Where we earlier stated that the subject of the Therma–Tru patent was fiberglass skins, the parties now state that that patent is for "Comprehensive Molded Door Assembly." Eagle–Picher did not manufacture door assemblies.

As we have indicated, the foregoing quotation was contained in our decision of the motion of EPI for summary judgment. We denied that motion, holding that there was an issue of fact as to whether Caradon knew of the date of the confirmation of debtors' plan before confirmation occurred. We commented further that there was a question as to "whether any knowledge of Caradon of the confirmation hearing, if knowledge was obtained, was obtained sufficiently in advance of the confirmation hearing that it might be regarded as reasonable."

An evidentiary hearing following remand was held September 24, 2001. The bulk of the hearing was devoted to the issue of whether debtor had mailed notice of the confirmation hearing to Caradon before the confirmation hearing. Also dealt with was the issue of allowability of Caradon's claim as an administrative expense, as well as the known/unknown issue.

Counsel in this matter have been extremely helpful to the court, for they filed a Joint Pretrial Statement (Document 6610) which contains a very extensive delineation of contested and uncontested facts. The court adopts as findings of fact all of the recitations of fact marked "Uncontested" in that document and incorporate those recitations by reference into this Decision. The most pertinent of those findings of fact will be quoted directly in the course of this Decision. Where this

occurs, reference to the Joint Pretrial Statement will preface the quotations. Additional findings of fact and conclusions of law will appear in the discussion which follows.

1. Notice

Peachtree Doors, Inc. ("Peachtree") was the predecessor of Caradon and it is understood by the parties that if notice was given to Peachtree, that is effective against Caradon. We deal first with the issue of whether Eagle–Picher[1] mailed notice of the confirmation hearing to Caradon.

\* \* \* \* \* \*

### FROM THE JOINT PRETRIAL STATEMENT

40. Uncontested. In March, 1991, Eagle–Picher filed a motion with the bankruptcy court to be authorized to provide noticing services required by Bankruptcy Rule 2002 and to be the bankruptcy court's "agent" to maintain the claims registry provided for in Bankruptcy Rule 5003(b). The court entered such an order on March 18, 1991. Pursuant to Eagle–Picher's motion filed December 11, 1996, the bankruptcy court, by order filed February 7, 1997, relieved Eagle–Picher of its duties as the court's agent in connection with docketing of claims and maintenance of the claims register, *nunc pro tunc* to January 31, 1997.

41. Uncontested. By its July 23, 1996 order, the bankruptcy court approved Eagle–Picher's Solicitation and tabulation procedures.

42. Uncontested. By Order entered August 28, 1996, the bankruptcy court approved Eagle–Picher's Joint Disclo-

---

1. Earlier in this matter we had stated that we would refer to pre-confirmation Eagle–Picher as "debtor." The parties have changed this, and refer to the pre-confirmation party as Eagle–Picher and we will follow that nomenclature. We will continue to refer to the reorganized debtor as "EPI."

sure Statement (the "Disclosure Statement") and scheduled a hearing on November 13, 1996 to consider confirmation of Eagle–Picher's Third Amended Consolidated Plan of Reorganization included in the Disclosure Statement.

43. Uncontested. After entry of the August 28, 1996 order, Eagle–Picher initiated the process of mailing Solicitation Packages to voting and non-voting creditors.

44. Uncontested. The Solicitation Packages mailed to non-voting creditors included the Disclosure Statement and Notice of (A) Solicitation of Votes to Accept or Reject the Debtors' Third Amended Consolidated Plan of Reorganization and (B) Hearing to Consider Confirmation of Debtors' Third Amended Consolidated Plan of Reorganization ("Notice of Confirmation Hearing"). The Solicitation package mailed to voting creditors included the Disclosure Statement, the Notice of Confirmation Hearing, and a ballot.

45. Uncontested. Caradon was listed in the debtor's schedules and statements as a party to an "Executory Contract" with Eagle–Picher and Eagle–Picher contends that Caradon was sent notice of the Confirmation Hearing in this capacity.

51. Uncontested. Any notice of the Confirmation Hearing sent to Caradon by Eagle–Picher was addressed to Peachtree Doors, Inc.'s correct post office address, P.O. Box 5700, Norcross Georgia, 30019–5700, but neither a specific individual nor an officer or director was identified on the mailing label.

57. Uncontested. Federated Claim Service Group ("Federated") was the tabulation agent for the Eagle–Picher bankruptcy.

59. Uncontested. Bowne was responsible for printing the Disclosure Statements, ballots, envelopes, and mailing labels for non-voting entities in connection with the Eagle–Picher bankruptcy.

60. Uncontested. Hill & Knowlton was responsible for mailing Solicitation Packages to holders of debt or equity securities. Caradon was not in the category of entities to which Hill & Knowlton was responsible for mailing Solicitation Packages. Bowne engaged Cleveland Letter to provide assistance in mailing the Solicitation Packages to all other categories of entities.

61. Uncontested. Cleveland Letter's responsibilities included inserting the Solicitation Packages in envelopes, metering the envelopes with proper first class postage, affixing mailing labels to non-voting Packages, and depositing the Solicitation Packages with the United States Postal service for mailing.

62. Uncontested. Hill & Knowlton was responsible for processing all returned mail, including coordinating with Federated and Eagle–Picher efforts to secure correct names and addresses for entities whose Solicitation Packages were returned and remailing such Solicitation Packages.

69. Uncontested. Utilizing creditor data electronically stored in Eagle–Picher's CIS, Federated furnished to Bowne electronically or by diskette the names and addresses of both voting creditors and non-voting entities to whom Solicitation Packages were to be mailed.

71. Uncontested. Federated generated from the CIS a printout dated September 16, 1996 (the "Federated QA Report") containing a complete list of the names and addresses of all voting and non-voting recipients, as reflected on the CIS.

72. Uncontested. Bowne used the data provided by Federated to prepare adhesive mailing labels for non-voting entities (the "Mailing Labels") and a corresponding non-voting label manifest ("Manifest") with the names and mailing addresses of all such entities as they appeared on the Mailing Labels.

73. Uncontested. Peachtree Doors, Inc., with a mailing address of P.O. Box 5700, Norcross, Georgia, 30019–5700, appears on page 52 of the Manifest.

74. Uncontested. The Manifest and Mailing Labels were delivered to Cleveland Letter on or before September 17, 1996.

75. Uncontested. Peachtree Doors, Inc., with a mailing address of P.O. Box 5700, Norcross, Georgia, 30019–5700, appears on page 111 of the Federated QA Report.

80. Uncontested. Cleveland Letter began preparing the Solicitation Packages on September 17, 1996 and finished the following day.

81. Uncontested. Cleveland Letter utilized a postage meter to apply First Class postage to envelopes used to mail voting and non-voting Solicitation Packages.

85. Uncontested. Upon receipt of the Solicitation Packages from Cleveland Letter, the United States Postal Service date-stamped and signed post office form 3606 verifying the receipt and weight of the Solicitation Packages on September 18, 1996.

86. Uncontested. Cleveland Letter received no complaint or notification from the United States Postal Service that any Solicitation Packages were improperly metered or lacked sufficient postage.

\* \* \* \* \* \*

■ The position of EPI on the present motion is that it mailed actual notice to Caradon of the confirmation hearing prior to the confirmation hearing. In addition, EPI contends that Caradon had actual notice of the confirmation hearing prior thereto, due to the activities of its counsel, David H. Kennedy. Caradon contends, to the contrary, that despite the steps for mailing notice of the confirmation hearing, taken by Eagle–Picher, Eagle–Picher has failed to prove that notice was actually mailed to Caradon or that it had notice through Kennedy.

The standard in the Sixth Circuit to be met to establish mailing appears in *Simpson v. Jefferson Standard Life Ins. Co.*, 465 F.2d 1320, 1324 (6th Cir.1972). There, the court said that "proof of a business system of preparing and mailing letters, and compliance with such a custom in a particular instance, is sufficient to establish proof of mailing." We hold that Eagle–Picher, by its evidence in this case, has met that standard.

Eagle–Picher had a carefully constructed plan for the mailing of notices. It maintained a claims information system (hereafter "CIS") as a database of creditors and other persons to be given appropriate notice. It contracted with Federated Claims Service which was given direct access to the CIS system whereby it prepared appropriate mailing lists. Those lists were supplied to Bowne which had the responsibility for printing necessary material. Bowne subcontracted with Cleveland Letter, a mailing house in Cleveland, whose task was to insert solicitation packages in envelopes, meter the envelopes with postage, affix mailing labels to non-voting packages, and deliver solicitation packages to the post office for mailing.

■ The responsible officials at Eagle–Picher did not merely assume that the notice system would work, but went to

Cleveland for the purpose of confirming that Cleveland Letter understood and would execute its role in the noticing system. We find as a fact that the voting and non-voting packages were spot checked by an Eagle–Picher representative against lists brought with them to Cleveland. No errors were found. The evidence established and we find as a fact that there was a mailing label for Peachtree included in the materials received by Cleveland Letter. Eagle–Picher has proved that it had a business system for preparing and mailing letters, and that it complied with that system in the present instance. We hold that mailing of notice to Peachtree has been proved. Proof of mailing gives rise to a presumption that what was mailed was received. *In re Nutri\*Bevco, Inc.*, 117 B.R. 771, 780 (Bankr.S.D.N.Y.1990).

■ Caradon seeks to rebut that presumption by evidence that notice was not received. It relies upon *In re Yoder Co.*, 758 F.2d 1114 (6th Cir.1985). Its position is that, based upon *Yoder*, "... Eagle–Picher is not entitled to rely on the presumption of receipt upon mailing, given that Caradon has presented persuasive testimony establishing its procedures for handling the receipt of legal notices and the fact that it did not in fact receive the non-voting Solicitation Package allegedly mailed to it by Eagle–Picher." (Post-hearing Brief of Caradon at p. 75.)

The court finds, however, that the evidence presented to it by Caradon does not support this statement. Caradon, in September, 1996, did not have an established procedure for routing of notices such as that sent by Eagle–Picher. Its mail room at that time was staffed by two people. One was Lynne Kelly and the other was Tony Lowe. Kelly began her work in June, 1996, while Lowe preceded her by two weeks. Lowe initially was Kelly's superior. Lowe's performance was careless as

Kelly had occasion to complain, and he was, after September, 1996, transferred out of the mail intake department. Kelly testified at the trial; Lowe did not, nor was his deposition presented. Kelly testified that if no individual's name appeared on the label on an envelope, she would open the envelope and would figure out where that item should go. If she had any questions, she would ask Sandra MacPherson, controller of the company, and Mac-Pherson would instruct her where to direct the item. Kelly testified that if an item related to bankruptcy, she would send it either to the credit department or to Mac-Pherson.

MacPherson also testified at the trial. She confirmed that mail not addressed to an individual would come to her. She had received bankruptcy documents. If they related to an employee she would direct them to the payroll department. If they related to customers, then to Bruce Morine, controller of the company.

Morine also testified. He had been with Peachtree from 1981 to 1997. He served as chief financial officer and vice president for finance. The accounting, payroll, and credit departments were under him. Morine testified that he did not receive notice of the Eagle–Picher confirmation hearing. But he said that what mail he received typically was certified. He testified that bankruptcy notices ordinarily would go to the accounts receivable or accounting departments; only if it was a major matter would it go to him.

What emerges from this testimony is that there was not an established standard procedure at Caradon for the handling of a piece of mail like the notice of confirmation sent out by Eagle–Picher. It would in the first instance have been received in the mail room. We are not informed as to what Lowe would have done with it if he was the person in the mail room who

received it. If Kelly received it she would have opened the envelope. She might then have sent it to the payroll department or she might have sent it to MacPherson for instruction as to where it should be sent. MacPherson said that Kelly or Lowe could have delivered mail which did not have a name on it if they were sure where to take it. If it came to her, she might direct it to Morine, an appropriate executive, if it was from a customer. If she did not know if it was a customer, she would ask the controller, Mike Mason. While she thought that she would have directed a notice such as the confirmation notice of Eagle–Picher to Morine, Morine's testimony was that the legal mail he received was for the most part certified. In addition, Eagle–Picher was not a customer, but a supplier. It is fair to infer from the foregoing that a legal notice sent by first class mail would not have come to Morine, or any other responsible executive of Caradon. In any case, from the foregoing, we reach the conclusion and hold that there was not an established standard procedure for the handling and direction of mail at Caradon. Thus, Caradon has failed to rebut the presumption that it received timely notice of the Eagle–Picher confirmation hearing.

■ As an additional ground for its position that any presumption of delivery is rebutted, Caradon argues that the record does not show that mailing by Eagle–Picher to Caradon was not returned. In support of this, Caradon cites cases holding that delivery of notice was proved, in which cases the court stated that the evidence established that mailed notice had not been returned. See In re Eagle–Picher Industries, Inc., 175 B.R. 943 (Bankr. S.D.Ohio 1994); In re Longardner and Associates, Inc., 855 F.2d 455 (7th Cir. 1988); In re Monroe Distributing, Inc., 176 B.R. 458 (Bankr.N.D.Ohio 1995); Ohio Casualty Insurance Co. v. Hoback (In re Hoback), 200 B.R. 28 (Bankr.W.D.Ky. 1995); United States v. Messics (In re Messics), 159 B.R. 803 (Bankr.N.D.Ohio 1993). Caradon in this argument raises a question of law. That question is whether it is a part of a notice-giver's burden of proof to show, in addition to the mailing, that the notice was not returned.

The primary Sixth Circuit case regarding notice in a case such as this, the Jefferson Standard case, supra, does not include a requirement of an ability to account for returned mail as part of the burden that the notice-giver must bear. The same is true for all of the cases cited by Caradon. In each of those cases, the court mentions the fact that mail was not returned as an additional factor supporting its conclusion that notice was duly given. None of them says that it would reach a different conclusion if that factor were not present. We therefore conclude that the absence of evidence that any mailing to Caradon was not returned, cannot alter our conclusion that Eagle–Picher was entitled to a presumption of delivery, and that Caradon's evidence of non-delivery was insufficient to rebut the presumption.

Caradon also argues that any notice sent by Eagle–Picher was inadequate for failure to comply with F.R.B.P. 2002(g)(2). The failure, says Caradon, is that Eagle–Picher scheduled Caradon as a party to an executory contract (Movant's Ex. 38) in Schedule G, and Schedule G requires a listing in the Schedule by name and address of other parties to the contract. This, says Caradon, implies an obligation to address notices to those named in the contract, and Eagle–Picher did not do this.

We disagree that such an obligation is implied. Schedule G adds nothing to what is required as to the sending of notice stated in F.R.B.P. 2002(g)(2) and there is no indication that Eagle–Picher did not

comply with the requirement of F.R.B.P. 2002(g)(2).

■ Caradon also argues that notice was inadequate for failure to comply with F.R.B.P. 7004(b)(3). The Rule there provides that service on a domestic corporation requires that notice be sent to the attention of an officer or agent, and here it is conceded that notice was sent to the corporation without naming an individual. Caradon asserts that F.R.B.P. 7004 is applicable because a motion to confirm a plan commences a contested matter, governed by F.R.B.P. 9014.

But F.R.B.P. 9014 by express statement does not apply to contested matters "otherwise governed by these rules." F.R.B.P. 2002(b) deals expressly with the time fixed for a hearing to consider confirmation of a Chapter 11 plan. F.R.B.P. 2002(g) then provides the notice requirements in such a case. F.R.B.P. 7004(b)(3) therefore has no application here. *See In re Riverchase Apartments, L.P.*, 184 B.R. 35, 39, n. 3 (Bankr.M.D.Tenn.1993).

EPI also contended that Caradon had actual notice on the basis of knowledge of Caradon's counsel, David H. Kennedy. That was the subject of a motion for summary judgment by EPI which was denied. EPI contended that Kennedy, prior to the confirmation hearing, had received a copy of the disclosure statement in which the date of the confirmation hearing appeared. The court denied the motion for summary judgment in view of issues of fact, one of them being whether the disclosure statement that Kennedy may have seen contained the date of the confirmation hearing. After considering the relevant evidence, we hold that EPI failed to prove that any disclosure statement reviewed by Kennedy contained the date of the confirmation hearing.

2. Administrative Expense Claim

a. Effect of § 1141(d).

It is the position of Caradon that the claims which it asserts in the Georgia court could be asserted as an administrative expense claim. Those claims are (1) breach of contract and breach of warranty of non-infringement, (2) contributory patent infringement, (3) common law contribution, (4) common law indemnification, and (5) negligent misrepresentation. Caradon is not here pursuing its claim for negligent misrepresentation. The first time that Caradon made claim on these accounts was by filing the Georgia lawsuit. This was after confirmation of Eagle–Picher's reorganization plan. We will hereafter refer to the four remaining causes asserted by Caradon in its Georgia suit as "the Georgia claims." Caradon has not formally asserted those claims in this court.

Caradon had been buying products from Eagle–Picher prior to the filing of the bankruptcy case and throughout the period from before the filing of the Eagle–Picher bankruptcy case through the duration of that case, to confirmation. It limits its claim here to the period between the filing of the petition and the confirmation of Eagle–Picher's plan.

Legislative history as related in *Hall Financial Group, Inc. v. DP Partners Ltd. Partnership (Matter of DP Partners Ltd. Partnership)*, 106 F.3d 667, 672 (5th Cir. 1997), recognizes that neither statute nor rule provides a framework for setting an administrative expense bar date. It is also true that a court may set such a date. No administrative claims bar date, however, was set in this case by the court.

It is Caradon's position that because no administrative claims bar date was set in this court, it matters not that its Georgia claims were not asserted until after confir-

mation. It bases its position upon 11 U.S.C. § 1129(a)(9)(A) which provides:

### § 1129. Confirmation of plan

(a) The court shall confirm a plan only if all of the following requirements are met:

\* \* \* \* \* \*

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—

(A) with respect to a claim of a kind specified in section 507(a)(1) or 507(a)(2) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;

\* \* \* \* \* \*

In opposition, it is the position of EPI that the claims of Caradon are barred by provisions in the Plan and by 11 U.S.C. § 1141(d)(1)(A). The statute there provides:

### § 1141. Effect of confirmation

(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

\* \* \* \* \* \*

It is noteworthy that in the § 1141(d) discharge, Congress provided that the dis-

charge extended to "any debt that arose before the date of . . . confirmation." This contrasts with the Chapter 7 discharge which, at § 727(b), extends only to prepetition debt.

■ This court reaches the conclusion that Caradon's position that § 1129(a)(9)(A) creates a right to assert an administrative expense claim post-confirmation, which is based upon conduct pre-confirmation, is unsound. The very language of that Code provision limits its reach to administrative expense claims which are asserted pre-confirmation. The title of the Code section in which the provision occurs is "Confirmation of Plan," and it contains a number of provisions dealing with hurdles that a debtor must leap before a plan can be confirmed. It does not deal with post-confirmation matters. Further, the provision in question provides that an administrative expense claimant is to receive its compensation on the effective date of the plan. Obviously, a claim filed after the effective date of the plan such as the claim of Caradon here, cannot by that time be compensated. In addition, the reference in the Code provision under discussion, § 507(a)(1) specifies "administrative expenses allowed under section 503(b) of this title," does not include claims such as those of Caradon because its claims have not been allowed. This court holds that 11 U.S.C. § 1129(a)(9)(A) does not create a right to assert an administrative expense claim filed after confirmation in a Chapter 11 case.

Caradon asserts that there is support for its position in *Wallach v. Frink America (In re Nuttall Equip. Co., Inc.)*, 188 B.R. 732 (Bankr.W.D.N.Y.1995). In the *Nuttall* case, a creditor, Frink America, Inc., filed a Chapter 11 case in June, 1992. Frink's reorganization plan was confirmed November 3, 1993. Meanwhile, Nuttall, the debtor, which had done business with

Frink, filed a Chapter 11 case on August 20, 1993. During the 90 days prior to that date, Nuttall made $22,000.00 in payments to Frink that were stipulated to be preferential payments. The *Nuttall* case was converted to Chapter 7, and the Chapter 7 trustee pursued the $22,000.00 preferential payment for the Nuttall estate. Nuttall's claim was asserted after confirmation of the Frink plan. The court in *Nuttall* held that the injunction of § 1141(d) did not bar Nuttall's post-confirmation claim, saying that the preference claim was an ordinary cost of doing business. In reaching its conclusion, the court in *Nuttall* asserted that application of § 1141(d) "would produce a logical absurdity if not read in *para materia* with § 1129(a)(9)(A)."

■ This court perceives no such logical absurdity. The respective Code sections here under discussion are clearly stated and not inconsistent. Section 1129(a)(9)(A) by its express language deals with administrative expense claims filed pre-confirmation. The injunction in § 1141(d) by its express language bars the assertion post-confirmation of claims based on acts pre-confirmation and makes no exception for administrative expense claims. We hold that Caradon's claim was discharged by § 1141(d).

Even if we were to recognize the validity of the *Nuttall* holding, the case is distinguished on its facts. At p. 735, the court states that Nuttall was not listed or scheduled as a creditor in the Frink bankruptcy case. This is followed by a statement, somewhat confusing, which we understand to be a statement by the court that there was no evidence that Nuttall knew that Frink was in bankruptcy prior to the time that demand for the preference payment was made. Thus, the *Nuttall* holding can be interpreted as one allowing the Nuttall claim on due process grounds. In the case before this court, to the contrary, we have

found that the requirements of due process have been satisfied by the mailing of notice to Caradon.

Our conclusion, an interpretation of the pertinent Code sections, is supported by *Kresmery v. Service America Corp.*, 227 B.R. 10 (D.Conn.1998). In that case, the District Court held that an employment discrimination claim which arose in the period post-petition and pre-confirmation, but claimed only post-confirmation, was discharged by the debtor's confirmation order. As is true in the case before us, it was a tort claim that was in issue in *Kresmery*.

Unlike the situation in the *Nuttall* case where the court was driven to reading into § 1141(d) an exception on account of ordinary course of business expenses, in the case before us, § 2.1 of the Eagle–Picher Reorganization Plan expressly excepts liabilities incurred in the ordinary course of business from discharge.

Caradon also asserts that *Texas Comptroller of Public Accounts v. Megafoods Stores, Inc. (In re Megafoods Stores, Inc.)*, 163 F.3d 1063 (9th Cir.1998), supports its position. The court there expressly says: "There is no bar date to filing requests for the allowance of administrative expenses under § 503(b) ..." That case cannot control the outcome here, however, for the context of the remark gives no assurance that that court would apply that statement to a fact pattern like that presently before this court. In *Megafoods*, as the court there said, the claimant "from the commencement of this case" had argued that the rate of interest to be applied was the statutory rate, with regard to the award of trust fund taxes found to be due to the Controller claimant. Because the question had always been in the case, the court even said that no request for payment of an administrative expense was necessary in order that the court determine the prop-

er rate of interest. The substantive question before that court was whether the award of interest was to be regarded as an administrative expense. The *Megafoods* court was in no way concerned with whether § 1129(a)(9)(A) overrides the clear language of § 1141(d), the position for which Caradon argues here, a position which this court declines to accept. An essential factual distinction between *Megafoods* and the case before this court is that the bankruptcy court there was aware well before confirmation, indeed from the commencement of the case, that payment of interest was an issue to be dealt with. Here, Eagle–Picher had no intimation pre-confirmation that Caradon would be asserting the claims raised in the Georgia litigation until that suit was filed post-confirmation.

Caradon also asserts that its position is supported in *Hall Financial Group, Inc. v. DP Partners Ltd. Partnership (Matter of DP Partners Ltd. Partnership)*, 106 F.3d 667 (5th Cir.1997). While interesting in reviewing legislative history and the pertinent Bankruptcy Rules, the facts of the case are simply different from the case before this court, for in *DP Partners*, an administrative expense bar date was set. The court there held that all that a claimant need do is file its administrative expense claim before that date, and the claimant there had done so.

It is further part of the rationale constructed by Caradon that "upon confirmation of a plan of reorganization, the discharge provisions of the Bankruptcy Code effect an exchange of administrative expense claims for the right to payment in full," and this exchange should extend to Caradon's claims. Caradon purports to find support for this proposition in *National City Bank v. Troutman Enters., Inc. (In re Troutman Enters., Inc.)* 253 B.R. 8, 11 (6th Cir. BAP 2000). But all that that case holds is that pre-confirmation debt is

replaced by claims to be dealt with in the plan. To the same effect, see *In re Nylon Net Co.*, 225 B.R. 404 (Bankr.W.D.Tenn. 1998). Those cases simply do not deal with the situation before this court, the effect of plan confirmation on claims that had *not* been asserted prior to confirmation.

b. Impact of Plan on Discharge.

■ EPI asserts that Caradon's Georgia claims were not only discharged by operation of 11 U.S.C. § 1141(d), but were also discharged by the terms of the confirmed Plan. Caradon contends that the Georgia claims are excepted from the discharge contained in the Plan. This court concludes that the Georgia claims are not excepted from the discharge contained in the Plan.

The following paragraphs of the Plan come into play in this connection:

**1.1.1 Administrative Expense.** Any Claim constituting a cost or expense of administration in the Chapter 11 Cases under section 503 of the Bankruptcy Code, including, without express or implied limitation, any actual and necessary costs and expenses of preserving the estate of the Debtors, any actual and necessary costs and expenses of operating the businesses of the Debtors in Possession in connection with the conduct of its or their business or for the acquisition or lease of property or the rendition of services, any allowed compensation or reimbursement of expenses under section 503(b)(2)–(5) of the Bankruptcy Code, and any fees or charges assessed against the estate of any of the Debtors under section 1930, chapter 123, title 28, United States Code.

**2.1 Payment of Allowed Administrative Expenses.** The Allowed Amount of each Allowed Administrative Expense shall be paid in full, in cash, on

the Effective Date; *provided, however,* that (i) *Administrative Expenses representing (a) liabilities incurred in the ordinary course of business by any of the Debtors in Possession* or (b) liabilities arising under loans or advances to the Debtors in Possession, whether or not incurred in the ordinary course of business, *shall be assumed and paid by the respective Reorganized Debtors in accordance with the terms and conditions of the particular transactions and any agreements relating thereto,* (ii) the Bankruptcy Court shall fix in the Confirmation Order a date for the filing of and a date to hear and determine all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code, and (iii) if an Administrative Expense, other than a trade payable incurred in the ordinary course of business by any of the Debtors in Possession and other than a DIP Credit Facility Claim, is a Contingent Claim or Unliquidated Claim as of the Effective Date, the Debtors may request the Bankruptcy Court to estimate such Administrative Expense pursuant to section 502(c) of the Bankruptcy Code, in which case the Allowed Amount of such Administrative Expense shall be paid in full, in cash, on the date that an order estimating such Administrative Expense becomes a Final Order. (Emphasis supplied.)

**12.2 Discharge of the Debtors.** The rights afforded in the Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever, including any interest accrued thereon from and after the Petition Date, against the Debtors and the Debtors in Possession, or any of their estates, assets, properties, or interests in property.

Except as otherwise provided herein, on the Effective Date, all Claims against and Equity Interests in the Debtors and the Debtors in Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors in Possession except those expressly assumed by the Reorganized Debtors in the Plan. All Entities shall be precluded and forever barred from asserting against the Debtors, the Reorganized Debtors, their respective successors or assigns, or their assets, properties, or interests in property any other or further Claims based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.

From these provisions, the intention in the Plan may b discerned. The Plan, in paragraph 1.1.1, gives a comprehensive definition of "Administrative Expense." It then in paragraph 2.1 deals separately with administrative expenses incurred in the ordinary course of business. Such administrative expenses can be incurred post-confirmation, for the reorganized debtors are to pay them. Thus, administrative expenses incurred in the ordinary course of business are to be unaffected by the discharge provided in paragraph 12.2 of the Plan. It follows that it is the intention in the Plan that administrative expenses *not* incurred in the ordinary course of business are to be subject to the discharge in paragraph 12.2.

Caradon contends that its Georgia claims are within the exception of paragraph 2.1. EPI asserts that they are not. A resolution of this difference turns on the interpretation of "ordinary course of business" as used in paragraph 2.1.

It is well established that a confirmed Chapter 11 plan is essentially a new contract. *In re Troutman Enterprises, Inc.,* 253 B.R. 8, 11 (6th Cir. BAP 2000). It is to be interpreted by rules of contract construction. *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Assn.,* 997 F.2d 581, 588 (9th Cir.1993), *cited with approval in In re Arbors of Houston Associates, L.P.,* 1999 WL 17649 (6th Cir.1999). A basic rule of contract construction is:

It is a universal rule that a contract must be construed as a whole and that the intention of the parties is to be ascertained from the entire instrument. A contract being construed is to be considered as a whole and the meaning gathered from the entire context, and not from particular words, phrases, or clauses, or from detached or isolated portions of the contract. All the words in a contract are to be considered in determining its meaning, and the entire contract and all of its parts should be read and treated together.

17A Am.Jur.2d § 385.

We turn, then, to a determination of the meaning of "ordinary course of business" as that phrase is used in paragraph 2.1. That phrase as used in the Plan has to do with claims by creditors. The status of creditor carries with it the fact that there is or was a business relationship between Eagle–Picher and that creditor, and the claim of the creditor arose from that relationship. We hold that the meaning of the phrase "ordinary course of business" as that phrase is used in the Eagle–Picher Plan must be determined in light of the actual business relationship between Caradon and Eagle–Picher. These are the facts of that relationship:

\* \* \* \* \* \*

### FROM THE JOINT PRETRIAL STATEMENT

9. Uncontested. In 1988, Peachtree and Eagle–Picher entered into a business relationship described in more detail below, pursuant to which Eagle–Picher began manufacturing fiberglass skins for use in compression molded door assemblies produced by Peachtree and marketed as the Newport Door.

12. Uncontested. Caradon began purchasing fiberglass door skins from Eagle–Picher for production of doors by mid–1989 and it did so through and after November 18, 1996, the date this Court's Order of Confirmation in the Eagle–Picher bankruptcy cases became effective. On January 7, 1991, during the pendency of the relationship between Eagle–Picher and Caradon, Eagle–Picher filed its petition in bankruptcy, which commenced this bankruptcy proceeding.

16. Uncontested. Peachtree initiated the purchase of each lot of door skins through the issuance of separate purchase orders. Deliveries of door skins on account of such purchase orders were made over the life of the relationship between Eagle–Picher and Caradon, including the delivery of numerous door skins subsequent to January 7, 1991, the Petition Date.

\* \* \* \* \* \*

That was the ordinary course of business between Caradon and Eagle–Picher. That it was this business to which paragraph 2.1 is referring is clear from the language "paid in accordance with the terms and conditions of the particular transactions," for this is an express reference to the ongoing business between Caradon and Eagle–Picher. It is this business which fits within the common definition of ordinary course of business:

In general, any matter which transpires as a matter of daily custom in business.

Black's Law Dictionary (5th Ed.) P. 989.

Thus, the ordinary course of business between Eagle–Picher and Caradon was

the on-going ordering, shipping and paying for, the goods sold by Eagle–Picher to Caradon. We hold that matters not part of the day-to-day interaction between the parties are not within the exception of paragraph 2.1 of the Plan. Claims for contributory patent infringement, breach of contract and warranty of non-infringement, common law contribution and common law indemnification were not part of that day-to-day interaction. We hold, therefore, that Caradon's Georgia claims were discharged by paragraph 12.2 of the confirmed Plan of Eagle–Picher.

We have above arrived at a conclusion based on a consideration of the entire confirmed Plan. That conclusion is that Caradon's Georgia claims are not within the scope of the exception to discharge of administrative expense claims set out in paragraph 2.1. Caradon has argued that the result should be otherwise. It contends that paragraph 2.1 is ambiguous and extrinsic evidence should be admitted, and extrinsic evidence would establish that Eagle–Picher in the Plan did not intend to bar claims like the Georgia claims of Caradon. Caradon's position in this regard is without merit. We hold that the Plan is not ambiguous.

Caradon says that the Plan is ambiguous "because it does not clearly state that creditors must assert their claims prior to confirmation to avoid their discharge." (Post-hearing Brief of Caradon, p. 55.) While Caradon suggests (*Id.* p. 55) that it is improper to "cross-reference" different parts of a plan in arriving at its meaning, the law is otherwise. The court has considered the language of the Plan as a whole in arriving at the meaning which we have stated in the preceding section of this Decision. Caradon has presented no authority for its proposition that ambiguity exists in the absence of an express statement that claims such as the Georgia claims would be barred unless asserted before confirmation, and this court can perceive no basis for reaching that conclusion when the language which is employed in the Plan is clear.

In another ground for its contention of ambiguity, Caradon argues that the phrase "ordinary course of business" is ambiguous because Caradon and Eagle–Picher differ as to the scope of that language. (*Id.* p. 56.)

■ The applicable law is:

\*   \*   \*   \*   \*   \*

And a contract is not rendered ambiguous simply because the parties do not agree on its proper construction...

17A Am.Jur.2d § 338.

Because the parties do not agree as to the interpretation of "ordinary course of business," does not make the Plan ambiguous. This court has arrived at a conclusion to the meaning of the phrase "ordinary course of business," derived from a consideration of the language of the entire document. That legal conclusion leaves no room for a claim of ambiguity.

There being no basis for a conclusion of ambiguity in the Plan, extrinsic evidence will not be considered.

Caradon also argues, chiefly on the basis of *Wallach v. Frink America (In re Nuttall Equip. Co., Inc.)*, 188 B.R. 732, 737 (Bankr.W.D.N.Y.1995), that there is case authority that "ordinary course of business" should be interpreted broadly enough to encompass the Georgia claims. (Caradon Post-hearing Reply Brief, p. 5.) We disagree. The court in *Nuttall* was not applying principles of contract construction in arriving at a definition of the phrase. Our conclusion is based on the application of those principles.

### 3. Known v. Unknown

■ At the September 24, 2001 hearing, Caradon argued that the known/unknown issue had been removed from consideration by EPI. Caradon said this occurred when EPI raised the question of whether actual notice of the confirmation hearing had been given to Caradon. Caradon stated that it would be prejudicial for the court to consider this issue at this time and proposed to offer evidence to show that it had discontinued discovery efforts relating to the known/unknown issue when the actual notice issue was introduced, and discovery was limited to that issue. (As we have stated, at Caradon's request, discovery was subsequently expanded to encompass the issue of allowance of an administrative expense claim.)

At the hearing, the court denied the request of Caradon that it be permitted to offer evidence about discovery contemplated on the known/unknown issue, but not pursued. Caradon did make a proffer of that evidence on the record. The court held, and stated on the record at the hearing, that the known/unknown issue was in the case. As long ago as August 29, 2001, the court called the attention of the parties to the fact that in its remand to this court, the District Court had directed that this court resolve the known/unknown issue, and that would have to be dealt with. Caradon did not then or at any subsequent time prior to the hearing request that it be given an opportunity to conduct further discovery with respect to the known/unknown issue. Caradon did not at any time prior to the September 24, 2001 hearing raise a claim of prejudice with regard to the known/unknown issue. This court will therefore, as it must, decide the known/unknown issue on the basis of the record before us.

■ In this connection, we observe that where there is a remand from an appellate tribunal this court is obliged to follow the mandate of the appellate tribunal. *Mefford v. Gardner*, 383 F.2d 748 (6th Cir.1967); *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources*, 71 F.3d 1197 (6th Cir. 1995). In this case, there is an express mandate by the District Court that on remand the known/unknown issue be resolved consistent with the guidelines provided by the District Court.

The District Court vacated our holding that Caradon was an unknown creditor, and remanded the case to this court for further findings. The District Court held that this court erred when it stated that a known creditor "is one that a debtor reasonably can expect to assert a claim." To guide this court in its further inquiry, the District Court said:

For notice purposes, creditors are divided into two types, "known" and "unknown." *See Charter Crude Oil Co.*, 125 B.R. at 654. Due process requires that known creditors be given actual written notice of actions in a bankruptcy case that might affect their interests. *See Chemetron Corp. v. Jones*, 72 F.3d 341, 346 (3d Cir.1995). *cert. denied*, 517 U.S. 1137, 116 S.Ct. 1424, 134 L.Ed.2d 548 (1996). For unknown creditors, publication notice is generally sufficient. *See id.*

The United States Supreme Court has defined a "known" creditor as one whose identity is either known or "reasonably ascertainable by the debtor." *Tulsa Professional Collection Services, Inc. v. Pope*, 485 U.S. 478, 490, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). An "unknown" creditor is one whose " 'interests are either conjectural or future, or, although they could be discovered upon investigation, do not in due course of business come to

knowledge' [of the debtor]." *Chemetron,* 72 F.3d at 346 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 317, 70 S.Ct. 652, 94 L.Ed. 865 (1950)).

"A creditor's identity is reasonably ascertainable if that creditor can be identified through 'reasonably diligent efforts.'" *Chemetron,* 72 F.3d at 346 (quoting *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 798 n. 4, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983)). "A debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.'" *Chemetron,* 72 F.3d at 346 (quoting *Charter Co.,* 125 B.R. at 654).

The District Court further said that the question is not answered by the debtor's knowledge of the *identity* of Caradon. The District Court said that:

> The critical inquiry in this case is whether Appellant's *claim was known* to the Debtor. In other words, was the fact that Appellant might have a post-petition claim against the Debtor "reasonably ascertainable" to the Debtor. (Emphasis supplied.)

The District Court also commented on the fact that Caradon conceded that it had never asserted claims in any forum before the confirmation of the plan and that it never gave the debtor notice in any form, of its belief that it had a right, contingent or otherwise, to payment from the debtor.

Further informing this court on this remand, is the order of the District Court of June 17, 1999, denying Caradon's motion for reconsideration. In its motion, Caradon there asserted that the fact that Eagle–Picher was aware of patent litigation against Caradon related to doors incorporating products purchased by Caradon from debtor post-petition, a fact which was undisputed, should make remand unnecessary. The District Court rejected this argument, saying:

> ... The Debtor's knowledge of appellant's identity and of the litigation involving products purchased by Appellant from Debtor post-petition does not, as a matter of law, *equate to knowledge that Appellant might have a post-petition claim against Debtor.* Because Debtor continues to dispute that Appellant was a known creditor and because the proper identification of Appellant as a known or an unknown creditor requires resolution of that disputed issue of fact, the Court's order remanding this action to the Bankruptcy Court, as a trier of fact, is appropriate. (Emphasis added.)

Thus, the District Court in its decision, and further in its ruling on the motion for reconsideration, has stated that it is not sufficient to make a creditor "known," that its identity as a creditor be known to the debtor. That court said:

> The critical inquiry in this case is whether Appellant's claim was known to the debtor.

Clearly, in this case, the question is whether Caradon's patent and other claims, derivative of its Therma–Tru litigation, which it first asserted post-confirmation, were known to Eagle–Picher pre-confirmation. The following findings of fact are pertinent:

\* \* \* \* \* \*

### FROM THE JOINT PRETRIAL STATEMENT

12. Uncontested. Caradon began purchasing fiberglass door skins from Eagle–Picher for production of doors by mid–1989 and it did so through and after November 18, 1996, the date this Court's Order of Confirmation in the Eagle–Picher bankruptcy cases became effective. On January 7, 1991, during the pendency of the relationship between Eagle–Picher and Caradon, Eagle–Picher filed its petition in bankruptcy, which commenced this bankruptcy proceeding.

17. Uncontested. On or about October 12, 1989, Therma–Tru instituted an action against Caradon in the United States District Court for the Eastern District of Michigan, styled *Therma–Tru Corporation v. Peachtree Doors Inc., ACME Flighting Door, Inc. d/b/a Edwards Wholesale, and Village Doors*, Civil Action File No. 89–CV–73028 (*Therma–Tru I*). In the Complaint in *Therma–Tru I*, Therma–Tru alleged that Caradon had infringed the 540 Patent through the manufacture and sale of doors claimed in the 540 Patent. All of the Caradon doors at issue in *Therma–Tru I* incorporated the fiberglass door skins manufactured by Eagle–Picher.

36. Uncontested. Caradon admits that by late 1991 or early 1992, and thereafter, Caradon had actual knowledge of Eagle–Picher's bankruptcy. Caradon knew that a bankruptcy case involving a debtor of Caradon could discharge or otherwise adversely affect a claim that Caradon might have against the debtor.

37. Uncontested. Caradon did not tender to Eagle–Picher the defense of either *Therma–Tru I* or *Therma–Tru II*.

38. Uncontested. Caradon did not consider or discuss bringing an action against Eagle–Picher either at the time of the Federal Circuit's *Therma–Tru I* decision in January 1995 or at the time of the November 1995 damages judgment in *Therma–Tru I*.

Based on the record before the court, the court holds that Caradon was an unknown creditor of Eagle–Picher. It follows that requirements of due process were satisfied by notice by publication. There is no evidence in the record before us to show that, pre-confirmation, Eagle–Picher knew that Caradon would assert the Georgia claims. Those claims existed as early as October 12, 1989, when Therma–Tru sued Caradon for patent infringement. It is perhaps understandable that Caradon did not assert any claims against Eagle–Picher in the course of litigation of Therma–Tru I, for it was to its advantage that Eagle–Picher assist it in that litigation. But after things turned against Caradon with the reversal of the decision of the District Court favoring Caradon in January, 1995, Caradon still did not do anything to make Eagle–Picher aware that it held a derivative claim from the Therma–Tru I litigation, against Eagle–Picher. Nor did it do anything subsequently to make Eagle–Picher aware of the claims it presently asserts, during the course of the Therma–Tru II litigation.

The test we are to apply here in resolving the known/unknown dispute, is whether Caradon's claim was "reasonably ascertainable" before the date of the confirmation hearing. Further, "reasonably ascertainable" means, not just that Caradon's identity as a creditor was known, but that Caradon had made known to Eagle–Picher the claims against Eagle–Picher that it asserted in the Georgia suit. Eagle–Picher was selling door skins to Caradon throughout the period from the filing of its bankruptcy petition until the date of confirmation, a period of some six years. Throughout that entire period Caradon was litigating with Therma–Tru. It must be borne in mind that the Therma–Tru patent was for a "Comprehensive Molded Door Assembly." Caradon manufactured and sold such a product. Eagle–Picher did not; it provided only a component used in making the door assembly. It is not self-evident from the fact that Caradon was being pursued as an infringer, that claims derived therefrom could be asserted against Eagle–Picher.

It is because Caradon never did anything to assert the Georgia claims against Eagle–Picher prior to confirmation, though

they certainly existed throughout the entire period of the bankruptcy, that we hold that Caradon was an unknown creditor.

A central source of authority upon which the District Court based its decision was *Chemetron Corp. v. Jones,* 72 F.3d 341 (3rd Cir.1995). Because of this, this court has paid particular attention in reaching its conclusion to cases cited by the *Chemetron* court.

In *Trump Taj Mahal Assocs. v. O'Hara (In re Trump Taj Mahal)* 1993 WL 534494 (D.N.J. Dec. 13, 1993), a slip and fall personal injury claimant notified the debtor prior to bankruptcy of her claim. The debtor responded with a willingness to make compensation and requested information. The claimant did not respond. The debtor subsequently filed its bankruptcy, and the court allowed notice by publication. The District Court held that the bankruptcy judge had not erred in finding claimant's claim to be speculative and conjectural, because claimant had failed to respond to debtor's letter. Claimant was deemed an unknown creditor and was therefore barred by notice by publication. In *In re Charter Co.,* 125 B.R. 650 (M.D.Fla.1991), the District Court reversed the finding by the Bankruptcy Court which had held that creditor was a known creditor. The bankruptcy court had held that debtor's knowledge that there was "at least a possibility of a claim" make it a known creditor. The Florida District Court, in reversing, disagreed, holding that such knowledge was inadequate support for the conclusion that the creditor was a known creditor. The District Court which reviewed our prior decision quoted from *Charter:* "A debtor does not have a 'duty to search out each conceivable or possible creditor and urge that person or entity to make a claim against it.' "

On the basis of the foregoing cases and the record before us, it is fair to characterize the claim of Caradon as "only conceivable, conjectural or speculative." Further support for this conclusion is to be found *In re New York Trap Rock Corp.,* 153 B.R. 642 (Bankr.S.D.N.Y.1993) (when debtor has no knowledge of the claim, debtor has no obligation to search potential claimants and give them actual notice); *Matter of Chicago, Milwaukee, St. Paul and Pacific Railroad Co.,* 974 F.2d 775 (7th Cir.1992) (debtor's knowledge of contamination does not make it a known creditor, where it has no knowledge of a claim); *In re Trans World Airlines, Inc.,* 182 B.R. 102 (D.Del. 1995) (claimant unknown creditor notwithstanding that it had asserted a counterclaim in litigation with the debtor); *Grant v. U.S. Home Corp. (In re U.S.H. Corp. of New York),* 223 B.R. 654 (Bankr.S.D.N.Y. 1998) (claimants were unknown whose claims arose from homes not built to certain guidelines, which had not been disclosed to claimants); *Eisenberg Bros., Inc. et al. v. Clear Shield Nat'l, Inc. (In re Envirodyne Indus., Inc.),* 214 B.R. 338 (N.D.Ill.1997) (claimants asserting an antitrust claim were unknown creditors, for the anti-trust claims were only conjectural).

■■■ Caradon's position is that it was a known creditor because Eagle–Picher had assisted it in preparation of the Therma–Tru litigation; that Eagle–Picher was aware of breach of warranty claims; and that there were numerous listings by Eagle–Picher of Caradon as a creditor in Eagle–Picher's bankruptcy schedules. But these are insufficient to lead to a conclusion that Eagle–Picher knew of the claim of Caradon, so that Caradon was a known creditor. As the District Court made clear, knowledge of the existence of a creditor is insufficient to make that creditor a known creditor; it must be shown that the claim was known. That has not been shown here and we conclude that Caradon was an unknown creditor.

\*      \*      \*      \*      \*      \*

In view of the foregoing discussion, we find the issues in favor of Eagle–Picher Industries, Inc. After remand, this court concludes that Eagle–Picher's Motion for Order Enforcing the Plan and the Confirmation Order to Stay Actions of Caradon Doors and Windows, Inc. should be granted.