[No. B177971. Second Dist., Div. Four. Aug. 17, 2005.]

ZIMMERMAN, ROSENFELD, GERSH & LEEDS LLP, Plaintiff and Appellant, v.
GLEN LARSON, Defendant and Respondent.

## COUNSEL

Zimmerman, Rosenfeld, Gersh & Leeds, Gary L. Zimmerman and Rochelle A. Herzog for Plaintiff and Appellant.

Sievert, Young & Donahoe, Richard D. Sievert and Mark T. Young for Defendant and Respondent.

## OPINION

**CURRY, J.**—Appellant, the law firm of Zimmerman, Rosenfeld, Gersh & Leeds (ZRG&L), brought suit against its former client, respondent Glen Larson, seeking payment of fees incurred in its representation of Larson in a dissolution action. While the dissolution proceedings were pending in family court, Larson sought federal bankruptcy protection and obtained a confirmed plan of reorganization under chapter 11 after ZRG&L's representation ceased. The trial court granted Larson's motion for summary judgment in the attorney fees action on the ground that the firm had failed to disclose its agreement or a statement of compensation to the bankruptcy court for approval as required by title 11 United States Code[1] section 1129.

Our review of the record indicates that Larson did not present sufficient evidence to establish ZRG&L was required to comply with section 1129. We affirm nevertheless, because (1) the debt owed to ZRG&L, having arisen prior to the confirmation of the reorganization plan, was extinguished except to the extent it was dealt with in the plan; and (2) ZRG&L did not dispute for purposes of the summary judgment motion that the plan provided for payment to ZRG&L only if Larson's home sold for more than a certain amount or that the home sold for less than the amount specified.

---

[1] All further statutory references are to title 11 United States Code unless otherwise indicated.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Complaint*

In August 2003, ZRG&L brought suit to obtain payment of fees incurred in its representation of Larson in his marital dissolution action. The complaint alleged that approximately $243,000 was due and owing under a variety of legal theories, including breach of contract and quantum meruit. The complaint specifically alleged that Larson entered into a written contract with ZRG&L in August 1998; that he became indebted to ZRG&L within the previous two years; that an account had been stated within the previous four years; that money was owed on an open book account; and that Larson owed ZRG&L for the reasonable value of its services. The complaint did not mention the bankruptcy proceedings or the reorganization plan.

### *Motion for Summary Judgment*

Larson answered and moved for summary judgment. The grounds for summary judgment were (1) that the action was precluded by a confirmed reorganization plan under section 1141[2] and (2) barred by ZRG&L's failure to obtain bankruptcy court approval of its fees under sections 327 through 330.[3]

---

[2] Section 1141 provides in pertinent part: "(d)(1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—[¶] (A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—[¶] (i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title; [¶] (ii) such claim is allowed under section 502 of this title; or [¶] (iii) the holder of such claim has accepted the plan . . . ."

[3] Section 327 permits "the trustee, with the court's approval" to "employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons . . . to represent or assist the trustee in carrying out the trustee's duties under this title." (§ 327(a).) In addition, "[t]he trustee, with the court's approval, may employ, for a specified special purpose, other than to represent the trustee in conducting the case, an attorney that has represented the debtor, if in the best interest of the estate, and if such attorney does not represent or hold any interest adverse to the debtor or to the estate with respect to the matter on which such attorney is to be employed." (§ 327(e).)

Section 328 permits the trustee to "employ or authorize the employment of a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment, including on a retainer, on an hourly basis, or on a contingent fee basis" and permits the court to "allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." (§ 328(a).)

Section 329 requires "[a]ny attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title" to "file with the court a statement of the compensation paid or agreed to be paid, if such

The statement of undisputed facts (SOF) in support of summary judgment sets forth the following facts. In August 1998, Larson's wife Janet Larson[4] filed a petition for dissolution of their marriage. ZRG&L agreed to represent Larson in the dissolution proceedings. Approximately one year later, in May 1999, Larson filed a petition for bankruptcy. ZRG&L "was aware that Larson had filed a petition for bankruptcy relief" and "was aware that Larson had filed a bankruptcy petition on May 11, 1999." Larson and Janet entered into a marital settlement agreement (MSA) in November 2001. In May 2002, ZRG&L substituted out of the dissolution action, prior to entry of the final decree of dissolution. During the course of its representation of Larson, ZRG&L billed approximately $400,000. The amounts sought in its complaint "are for legal fees incurred on or before May 20, 2002." In other words, "ZRG&L is seeking fees for the period of time in which Larson was a debtor subject to the jurisdiction of the bankruptcy court."

The SOF went on to state that on November 20, 2002, "the bankruptcy court entered an order confirming Larson's bankruptcy reorganization plan," which became final. According to the SOF the reorganization plan "provided for payment to ZRG&L only if Larson's home sold for more than a specified minimum" and "Larson's home sold for less than the amount which would allow any payment to ZRG&L."[5] Further, "[a]t no time during Larson's bankruptcy did ZRG&L seek the bankruptcy court's approval of the terms of its fee agreement with Larson" and "[a]t no time during Larson's bankruptcy did ZRG&L seek the bankruptcy court's approval of the reasonableness of the fees billed to Larson."

In his memorandum of points and authorities, Larson primarily contended that summary judgment should be granted because any debts that arose postpetition and preconfirmation were wiped out by the plan of reorganization

payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation." (§ 329(a).) If the compensation agreed to or obtained "exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment." (§ 329(b).)

Under section 330(a)(1), the court may "award to a trustee, an examiner, a professional person employed under section 327 or 1103—[¶] (A) reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and [¶] (B) reimbursement for actual, necessary expenses." Section 330 expressly empowers the court to "determin[e] the amount of reasonable compensation to be awarded" and to "award compensation that is less than the amount of compensation that is requested."

[4] Janet Larson (Janet) is referred to in the SOF as Larson's former wife, but the moving papers also stated that no final decree of dissolution had been entered.

[5] It was explained in greater detail in Larson's declaration in support of summary judgment that the house sold for $5.675 million, and the expenses, obligations, and debts given priority over the amounts owed ZRG&L consumed the proceeds.

and the order confirming it. Secondarily, Larson contended that the action was barred by ZRG&L's failure to comply with sections 327 through 330, specifically arguing that court approval was required for Larson, as debtor-in-possession, to hire the firm and that its fees should have been submitted to the court for reasonableness review.

### Reorganization Plan

Larson's chapter 11 reorganization plan, attached as an exhibit to the SOF, generally divided his creditors and obligations into four categories: (1) administrative creditors, such as his bankruptcy lawyers; (2) entities to whom taxes were owed, namely the Internal Revenue Service (IRS) and the Franchise Tax Board; (3) class one and two secured creditors who held liens on the Larsons' real property; and (4) class three unsecured creditors. The plan provided that Larson's cash on hand (approximately $1 million) would be used to satisfy "all administrative claims, including professional fees," arrearages owed to the lienholder on his home, unsecured creditors who elected to receive 80 percent of their allowed claims, cash payments owed Janet under the MSA, and a portion of Larson's tax obligations.

The reorganization plan specifically described ZRG&L, along with another attorney and an accounting firm that had apparently also performed professional services for Larson, as "Non-Estate Professionals" [*sic*] who were "not entitled to be paid as administrative claimants." It stated that up to $350,000 would be applied from the proceeds of the sale of Larson's home to paying debt owed to ZRG&L and the accounting firm.[6] This distribution was contingent on there being proceeds left after funds went for the expenses of the sale, paying off the mortgage and real estate taxes and taxes on capital gains, general unsecured creditors, the IRS, and the Franchise Tax Board, and after $500,000 was reserved to permit Larson to purchase another home.

### Opposition

In its opposition, ZRG&L did not dispute the facts set forth in the SOF. It instead presented new evidence that Larson did not owe the firm any money as of the date he filed his bankruptcy petition. There was, at that time, a credit balance in his client trust account. ZRG&L set forth as "disputed" material

---

[6] Three specific written scenarios forecasting the distribution of proceeds from the sale of the house were attached to the plan as exhibits. Under these scenarios, if the house sold for $5.6 million, the "[p]ost-petition professionals" (presumably referring to the Non-Estate Professionals) would get zero from the sale proceeds; if the house sold for $6 million, the postpetition professionals would receive $213,000 from the sale proceeds; and if the house sold for $6.5 million, the postpetition professionals would receive $350,000 and some additional funds would go to the IRS and the Franchise Tax Board.

facts the following: "[ZRG&L] is seeking fees for services performed after LARSON filed his petition for relief under the bankruptcy code"; "[a]t the time LARSON filed his petition for relief under the bankruptcy code [ZRG&L] was not a creditor of LARSON"; "[t]he services [ZRG&L] preformed [*sic*] for LARSON were not in connection to his bankruptcy matter"; and "[ZRG&L] was not required to seek approval of their fees from the bankruptcy court."

In addition, rather than simply debate the legal points in its memorandum of points and authorities, ZRG&L also submitted the declaration of a bankruptcy law expert. The expert expressed the opinion that ZRG&L's lawsuit was not precluded by Larson's reorganization plan because the firm was not technically one of his creditors under section 101(10)(A), which defines creditor to mean an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor," and section 301, which provides that "[t]he *commencement* of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." (Italics added.) Although the expert conceded that the plan authorized Larson to use some of the proceeds from the sale of his house to pay Non-Estate Professionals such as ZRG&L, "[t]he fact that [the firm was] designated as a 'non-estate professional' clearly indicates ZRG&L was not employed by the bankruptcy estate, nor performing services for the estate." Moreover, according to the expert, "ZRG&L did not perform any services for the bankruptcy estate, was not employed by the Debtor in connection with the bankruptcy case nor the estate, and did not seek any compensation from the estate. Thus, the [reorganization plan] did not apply to ZRG&L."

In its opposition memorandum, ZRG&L argued (1) that Larson did not obtain a discharge of his debt to the firm because the debt was not in existence at the time Larson filed his bankruptcy petition and was not covered by the discharge or the plan and (2) that the firm did not have to seek approval from the bankruptcy court to represent Larson in the dissolution proceeding and/or bill for its services.

*Reply*

Larson stated in his reply that he did not dispute that ZRG&L was seeking fees incurred after he filed his bankruptcy petition. He disagreed that the firm was not a creditor on the date he filed the bankruptcy petition, but contended that resolution of that dispute was unnecessary because postpetition, preconfirmation claims were also discharged by confirmation of the reorganization plan.

In his reply, Larson contended for the first time that ZRG&L was required to file a disclosure statement under section 329 because it provided legal services to the debtor "in connection with" his bankruptcy case. The reply pointed to provisions in the reorganization plan, attached as an exhibit to the moving papers, which allegedly acknowledged Larson's need "to resolve his disputes with [Janet], over Janet's claims to Larson's properties, including various television series" and "incorporated [the MSA] into the reorganization plan." The reply also cited portions of the MSA, attached as another exhibit to the moving papers, which allegedly indicated that the home used to fund the reorganization plan was awarded to Larson as part of the marriage settlement; "confirm[ed] various business interests, professional goodwill and intellectual property rights to Larson"; and "obligated Janet to defer certain spousal support claims and obligated Larson to agree to an allocation of payments under Larson's reorganization plan that favored satisfaction of tax liabilities for which Janet was jointly liable ahead of tax liabilities for which only Larson was liable." According to the reply, this proved that "ZRG&L represented Larson in connection with community property and support issues material to his bankruptcy reorganization."

*Hearing and Order*

The court granted the motion for summary judgment, finding true the following facts set forth in the SOF: that Larson filed a bankruptcy petition in May 1999; that ZRG&L was aware of the filing; that the fees sought by ZRG&L were incurred on or before May 20, 2002; that the bankruptcy court entered an order confirming Larson's reorganization plan on November 20, 2002; that the bankruptcy case is closed; that ZRG&L is seeking fees for the time in which Larson was subject to the jurisdiction of the bankruptcy court; and that ZRG&L did not seek bankruptcy court approval for the terms of its fee agreement or the reasonableness of its fees. In addition, the court found true a fact that was not specifically contained in the SOF: that the reorganization plan confirmed by the court "incorporate[d] the terms" of the MSA.

In granting the motion, however, the court specifically found "11 U.S.C. § 327 does not apply to this case"; that "the effect of 11 U.S.C. § 1141 confirmation is not relevant to this case because ZRG&L is not necessarily and indisputably a creditor"; that the reorganization plan "does not state determinably that Larson need not pay ZRG&L if Larson's home sold for less than $6,000,000"; and that "this action is not precluded by the provisions of the bankruptcy court order confirming that plan." The ground for the decision to grant summary judgment was that "ZRG&L was obligated to file with the United States Bankruptcy Court a statement of the compensation paid or agreed to be paid by Larson pursuant to the provisions of 11 U.S.C. § 329, and failed to do so" and that "the legal services of ZRG&L to Larson were

subject to review under the reasonableness standards of 11 U.S.C. § 330 and that ZRG&L failed to seek such a review from the bankruptcy court during the course of Larson's bankruptcy proceedings."

Judgment was entered in favor of Larson and this appeal followed.

## DISCUSSION

In making its rulings on summary judgment, the trial court ignored fundamental flaws in both the moving and opposing papers. Specifically, although Larson argued that ZRG&L's representation in the dissolution proceedings was "in connection with" the bankruptcy under section 329, he set forth no facts in the SOF to support that position. Nonetheless, the trial court agreed that section 329 applied, implicitly finding that the representation was in connection with the bankruptcy. ZRG&L, for its part, conceded all of the facts set forth in the SOF, including the fact that the reorganization plan provided for payment to ZRG&L only if Larson's home sold for more than a specified minimum, and did not raise any issue concerning its potential rights under the plan. The trial court, however, found that the plan "does not state determinably that Larson need not pay ZRG&L if Larson's home sold for less than $6,000,000."

Generally, the trial court has discretion to disregard procedural imperfections, and base its ruling on the evidence submitted and the parties' memoranda. As we shall explain, however, the defects in Larson's moving papers and ZRG&L's opposition could not be overlooked because the evidence and other materials submitted did not alleviate the problems created by the parties' omissions and concessions.

## I

### Principles of Summary Judgment

We begin with a brief overview of basic principles governing summary judgment motions. "Any party may move for summary judgment in any action or proceeding if it is contended that the action has no merit or that there is no defense to the action or proceeding." (Code Civ. Proc., § 437c, subd. (a).) Subdivision (b)(1) of section 437c of the Code of Civil Procedure provides: "The supporting papers shall include a separate statement setting forth plainly and concisely all material facts which the moving party contends are undisputed. Each of the material facts stated shall be followed by a reference to the supporting evidence. The failure to comply with this requirement . . . may in the court's discretion constitute a sufficient ground for denial of the motion."

Likewise, "[t]he opposition papers shall include a separate statement that responds to each of the material facts contended by the moving party to be undisputed, indicating whether the opposing party agrees or disagrees that those facts are undisputed. The statement also shall set forth plainly and concisely any other material facts that the opposing party contends are disputed. Each material fact contended by the opposing party to be disputed shall be followed by a reference to the supporting evidence. Failure to comply with this requirement . . . may constitute a sufficient ground, in the court's discretion, for granting the motion." (Code Civ. Proc., § 437c, subd. (b)(3).)

Section 437c, subdivision (c) of the Code of Civil Procedure states that the "motion for summary judgment shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

■ As a reviewing court, "we determine de novo whether an issue of material fact exists and whether the moving party was entitled to summary judgment as a matter of law. [Citation.]" (*Brantley v. Pisaro* (1996) 42 Cal.App.4th 1591, 1601 [50 Cal.Rptr.2d 431].) In order to do so, "we must assume the role of the trial court and reassess the merits of the motion" taking into consideration "only the facts properly before the trial court at the time it ruled on the motion. [Citation.]" (*Ibid.*) In carrying out this function, "we apply the same three-step analysis required of the trial court: ' "First, we identify the issues framed by the pleadings since it is these allegations to which the motion must respond . . . . [¶] Secondly, we determine whether the moving party's showing has [satisfied his or her burden of proof] and justif[ies] a judgment in movant's favor . . . . [¶] When a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Id.* at p. 1602, quoting *Zuckerman v. Pacific Savings Bank* (1986) 187 Cal.App.3d 1394, 1400–1401 [232 Cal.Rptr. 458].)

■ "Contrary to what may be a widespread belief among the bench and bar . . . , [the Courts of Appeal] do not gleefully go about fabricating ad hoc, 'technical' reasons to overturn every grant of summary judgment pre-sented . . . for review. [Code of Civil Procedure s]ection 437c is a compli-cated statute. There is little flexibility in the procedural imperatives of the section, and the issues raised by a motion for summary judgment (or summary adjudication) are pure questions of law. As a result, section 437c is unforgiving; a failure to comply with any one of its myriad requirements is likely to be fatal to the offending party. [¶] . . . Any arbitrary disregard of the statutory commands in order to bring about a particular outcome raises procedural due process concerns. [Citation.] . . . The success or failure of the

motion must be determined . . . by application of the required step-by-step evaluation of the moving and opposing papers." (*Brantley v. Pisaro, supra,* 42 Cal.App.4th at p. 1607.)

■ Separate statements in particular "are required not to satisfy a sadistic urge to torment lawyers, but rather to afford due process to opposing parties and to permit trial courts to expeditiously review complex motions for [summary adjudication] and summary judgment to determine quickly and efficiently whether material facts are disputed." (*United Community Church v. Garcin* (1991) 231 Cal.App.3d 327, 335 [282 Cal.Rptr. 368].) "The due process aspect of the separate statement requirement is self-evident—to inform the opposing party of the evidence to be disputed to defeat the motion." (*Id.* at p. 337.)

Some courts enforce what is denominated the "Golden Rule" of summary judgment and summary adjudication: " '[I]f it is not set forth in the separate statement, *it does not exist.* Both the court and the opposing party are entitled to have all the facts upon which the moving party bases its motion plainly set forth *in the separate statement.*' " (*United Community Church v. Garcin, supra,* at p. 337, quoting Zebrowski, *The Summary Adjudication Pyramid* (Nov. 1989) 12 L.A. Law. 28, 29.)

The corollary to that rule required courts to accept as true everything in the separate statement that was not disputed by the party opposing summary judgment. (See *Brantley v. Pisaro, supra,* 42 Cal.App.4th at p. 1602 [court stated that in conducting its de novo review of a motion granting summary judgment it would "accept[] without question those . . . undisputed facts which were not contested by appellant"]; *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, 540–541 [12 Cal.Rptr.2d 629] [where opposing party argued on appeal that competent evidence did not support the grant of summary judgment, the Court of Appeal deemed the argument meritless because the opposing party "admitted each of the facts listed in [the moving party's] separate statement of undisputed facts" and thereby "waived any objection to the exhibits, discovery responses, and deposition testimony which formed the evidentiary basis of [the] separate statement"].)

More recently, appellate courts have taken a less stringent approach. In *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308 [125 Cal.Rptr.2d 499], the court held that the trial court has discretion to consider evidence not referenced in the moving party's separate statement and grant summary judgment or summary adjudication despite an inadequate separate

statement. (*Id.* at p. 315.)[7] The court based its decision on the express terms of the governing statute which, as we have seen, provides that the failure on the part of the moving party to comply with the separate statement requirement *"may in the court's discretion* constitute a sufficient ground for denial of the motion," and that similar failure on the part of the opposing party to comply with its statutory duties to refute facts set forth in the separate statement *"may* constitute a sufficient ground, *in the court's discretion,* for granting the motion." (Code Civ. Proc., § 437c, subd. (b)(1), (3), italics added.) This means, according to the court, "we may not mechanically conclude, as the 'Golden Rule' would have us do, that the court should never consider evidence not referenced in the separate statement. The statute is permissive, not mandatory. . . . Whether to consider evidence not referenced in the moving party's separate statement rests with the sound discretion of the trial court, and we review the decision to consider or not consider this evidence for an abuse of that discretion." (*San Diego Watercrafts, Inc., supra,* at pp. 315–316, citations omitted.)

■ In *Leep v. American Ship Management* (2005) 126 Cal.App.4th 1028 [24 Cal.Rptr.3d 463], the court likewise held that the trial court has discretion to treat the opposing party's failure to dispute a fact set forth in the separate statement as nonbinding where "other portions of the . . . separate statement and the evidence as a whole" warrant it. (*Id.* at p. 1039.) The court expressed the view that " ' " 'summary judgment should not be based on tacit admissions or fragmentary and equivocal concessions, which are contradicted by other credible evidence.' " ' " (*Ibid.,* quoting *Wright v. Stang Manufacturing Co.* (1997) 54 Cal.App.4th 1218, 1225, fn. 2 [63 Cal.Rptr.2d 422].)[8] We agree that the trial court has discretion under Code of Civil Procedure section 437c to overlook procedural errors in the moving and opposition papers, but only if the evidence presented warrants it. In the present case, we do not believe that the decision to overlook glaring omissions and concessions was warranted.

---

[7] The court went on to hold, however, that the trial court could not utilize evidence that "was not filed until after [the opponent] had responded to the issues raised in the separate statement" and that to do so violated the opposing party's due process rights. (*San Diego Watercrafts, Inc. v. Wells Fargo Bank, supra,* 102 Cal.App.4th at p. 316.)

[8] The court in *Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103 [54 Cal.Rptr.2d 669] went even further and held that "[t]he trial court may not grant summary judgment based on the opposing party's failure to file an adequate separate statement in a vacuum: It *must* first consider all of the submitted papers to determine whether there are triable issues of fact and whether the moving party is entitled to summary judgment as a matter of law." (*Id.* at p. 116, italics added.) We agree with the court in *San Diego Watercrafts* that "the *Kulesa* majority interpreted [Code of Civil Procedure section 437c] in a self-contradictory manner" by its failure to understand that "the section 437c, subdivision (c) requirement that the court consider all evidence submitted [is] limited, under subdivision (b), by the discretionary power of the court to ignore evidence not identified in the separate statement." (*San Diego Watercrafts, Inc. v. Wells Fargo Bank, supra,* 102 Cal.App.4th at pp. 313–314.)

## II

### Applicability of Sections 327 to 330

As is more fully described above, Larson argued in support of summary judgment that ZRG&L was subject to sections 327 through 330. As we have seen, section 327 permits the trustee,[9] with the approval of the court, to hire attorneys or "other professional persons" to assist him or her in carrying out his or her duties and to employ an attorney for a special purpose "if in the best interest of the estate." Sections 328 and 330 govern the payment of the compensation of those approved by the court and hired by the trustee. Section 330 in particular permits a court to award a "professional person employed under section 327" a reasonable compensation for "actual, necessary services rendered" after notice and hearing. Section 329 requires attorneys hired by the debtor within a year prior to filing a petition for bankruptcy to file with the court "a statement of the compensation paid or agreed to be paid . . . and the source of such compensation" and, if ordered by the court after the court has reviewed the disclosure, to disgorge excessive fees. Section 329 applies "whether or not such attorney applies for compensation under this title," but imposes its requirements only on attorneys hired to represent the debtor in a bankruptcy case or "in connection with" a bankruptcy case.

Larson contended both that ZRG&L was an attorney or "other professional person" subject to section 327 and that its representation was "in connection with" Larson's bankruptcy case under section 329. ZRG&L denied both contentions. The trial court sought to navigate a middle course by ruling that section 327 did not apply, but that ZRG&L was nevertheless required to comply with section 329.

On appeal, ZRG&L contends this represents an internal inconsistency in the trial court's ruling. Larson takes the position that an attorney can fall under the disclosure and review requirements of section 329 without being an attorney or other "professional person" within the meaning of section 327. The language of the two provisions is susceptible of Larson's interpretation. Section 327 refers to attorneys employed by *the trustee* "to represent or assist the trustee in carrying out the trustee's duties under this title" or "for a specified special purpose, other than to represent the trustee in conducting the case, . . . in the best interest of the estate." (§ 327(e).) Section 329 uses different terminology, applying to "[a]ny attorney representing *a debtor* in a case under this title [title 11], or in connection with such a case." (Italics added.) Section 329 requires a finding that the attorney fees under review be

---

[9] References to the "trustee" in these provisions are also applicable to a debtor-in-possession, such as Larson. (See *In re Land* (D.Colo. 1990) 116 B.R. 798, 803, fn. 3.)

"rendered 'in contemplation of'" or "'in connection with' a bankruptcy case." (*In re Keller Financial Services of Florida, Inc.* (M.D.Fla. 2000) 248 B.R. 859, 877.) Determining whether services were performed at a time when the debtor was contemplating bankruptcy requires use of a subjective test that inquires into the state of mind of the debtor. (*Id.* at p. 878.) Determining whether services were performed "in connection with" a bankruptcy requires consideration of objective factors, such as whether the legal services performed were "related to the precipitating cause of the bankruptcy" or "inextricably intertwined with the bankruptcy." (*Id.* at p. 879.)

Moreover, the two provisions come into play at different times: section 329 applies to attorneys hired up to "one year before the date of the filing of the petition" whereas section 327 can only be applied after the bankruptcy petition is filed. Finally, an attorney who does not seek to be compensated out of estate assets—because, for example, a family member is paying his or her fee—may not be concerned with section 327. But section 329 still requires that attorney to disclose his or her fee arrangement if his representation is in connection with the bankruptcy. "[E]ven if a debtor's attorney intends to receive no compensation whatever from the estate, [s]ection 329(a) assures that the court and other interested parties will be informed of the source and amount of the attorney's compensation for bankruptcy services." (*In re McDonald Bros. Const., Inc.* (N.D.Ill. 1990) 114 B.R. 989, 995.) As explained by the bankruptcy court in *In re Meyer* (Fla. 1985) 50 B.R. 3, 4, the "obvious purpose" of section 329 "is to enable the creditors to review the debtor's transactions with his attorneys and to seek, if necessary, the return of excessive payments made by a desperate debtor."

In any event, whether or not the trial court erred in its ruling concerning section 327 is not the crucial point since Larson no longer urges its applicability. The question here is whether the court was correct in concluding on the evidence presented that ZRG&L's representation in the dissolution proceedings was "in connection with" the bankruptcy for purposes of section 329. The only case we have found to have considered the issue of whether a divorce attorney falls under section 329 is *Matter of Swartout* (Ohio 1982) 20 B.R. 102, not cited by either side. There, the attorney who represented the debtor in his divorce action sought a finding that section 329 applied in order to obtain priority over other creditors. The attorney presented evidence to the bankruptcy court that the debtor and his wife were cosignors on a franchise and sublease agreement which enabled them to conduct a restaurant business. The wife ran the day-to-day operations, until she announced she wanted a divorce and moved out, taking the corporate books and records with her. The

attorney provided both family law and insolvency law advice. Indeed, the first time the debtor met with the attorney, they " 'discuss[ed] and plan[ned] to file a bankruptcy action as it appeared the Debtor was insolvent.' " (20 B.R. at p. 103.) But the wife refused to consider bankruptcy. Instead, she continued to try to operate the restaurant after divorce proceedings were initiated, and continued to take money out for her personal use without paying any of the creditors. The debtor became concerned he would be held in contempt by the court in the divorce action because he could not pay any of the couple's debts due to his insolvency. According to the attorney, "[t]his placed the Debtor in a position that he could not file his Petition for bankruptcy until such time as debt settlement was ordered by the Court or agreed upon by the parties." (*Id.* at p. 104.) In the meantime, creditors of the restaurant began to file suit against the debtor personally, and the attorney had to file "answers, motions to dismiss and other actions to delay until the bankruptcy could be filed." (*Ibid.*) In addition, the debtor was forced to subpoena the corporate records in the divorce action as the only way to obtain review.

Despite these facts, the court ruled that services performed in the divorce proceeding were not rendered "in connection with" the bankruptcy: "Debtor's attorney contends that, although 14.8 hours are 'directly allocated' to Debtor's divorce, the divorce and bankruptcy proceeding are almost 'inseparable.' This Court disagrees. Although a contemplated bankruptcy filing may alter legal tactics in a debtor's other involvements, legal services for matters unrelated to the ultimate bankruptcy proceeding should not be compensated as a priority expense if the services were not directly connected with the bankruptcy proceeding. In this case, the strategies used in Debtor's divorce proceeding were affected by the contemplated bankruptcy proceeding. The divorce proceeding itself, however, is separable, as not 'connected with' the case at bar as contemplated in 11 U.S.C. § 329(a)." (*Matter of Swartout, supra,* 20 B.R. at p. 106.) The court did, however, conclude that "the pre-Petition legal services regarding Debtor's corporate affairs were provided in preparation for Debtor's Petition filing in this Court and were undertaken primarily for purposes of protecting Debtor's bankruptcy privileges, and preserving Debtor's estate." (*Ibid.*) Accordingly, the court reduced the attorney's claim by 14.8 hours as "time billed on non-bankruptcy related services," and approved the remainder for priority payment. (*Id.* at p. 107.)

Other cases have considered the question of whether the debtor's divorce attorney should be employed as special counsel under section 327. In *In re Spencer* (E.D.N.C. 1985) 48 B.R. 168, 170, "[t]he debtor's voluntary chapter 11 case was precipitated by claims arising out of a domestic dispute," namely "[a] divorce and a judgment against the debtor for obligations incurred by [his wife] in the amount of $40,861.73, monthly child support, and monthly alimony" as well as substantial attorney fees owed to his own attorneys.

(*Ibid.*) The debtor maintained that "he cannot file a confirmable plan unless appeals are pursued to reduce the amount of the district court's award to [his wife]," and that employment of the dissolution attorneys "benefits the estate to the extent that the challenge to [his wife's] judgment enhances the chance of reorganization." (*Ibid.*) Also before the court was evidence that the debtor had assets not involved in the marital dispute which could have been liquidated and applied to unsecured claims. (*Id.* at p. 171.) On these facts, the court concluded it was not in the best interest of the estate to hire the dissolution attorneys and pay them out of estate assets. "The debtor is certainly entitled to vigorously defend the alimony litigation in state court, and in doing so, may retain the most competent counsel he can find—he does so, however, at his own expense, and not at the expense of the estate and his creditors." (*Id.* at pp. 171–172.)

A somewhat different result was reached in the *Matter of Colin* (S.D.N.Y. 1983) 27 B.R. 87, where the debtor in possession sought authorization to retain special counsel to represent him in divorce proceedings instituted after the filing of his chapter 11 petition. The debtor contended that "the divorce court could grant rights or interests to [his wife]" resulting in diminishment of the estate; that the divorce court's findings "might affect the validity or amounts of claims that [his wife] will file in [the] Chapter 11 proceeding"; and that "[his wife] may be granted rights or interests in debtor's property currently in the Chapter 11 estate." (*Id.* at p. 88.) The creditor's committee opposed retention on the ground that "[i]f [debtor's wife] is granted rights or interests in pre-petition property . . . then that property is not included in the estate"; "[i]f [debtor's wife] is granted rights or interests [in] property that is currently in the Chapter 11 estate, she is stayed from going against such property until and if such property reverts to [the debtor] after confirmation"; and "[i]f [debtor's wife] files a claim in [bankruptcy court], . . . any property interest granted to her in the divorce proceeding would be disallowed." (*Id.* at p. 89.)

The court agreed that under the circumstances retention of counsel was in the best interest of the estate, but only as to part of the fees likely to be incurred in the dissolution proceeding: "The Court does perceive that special counsel's services in the divorce proceeding will concern the dissolution of the marriage as well as disposition of property. *The latter is within the scope of the retention authorized; the former is not.*" (*Matter of Colin, supra,* 27 B.R. at p. 89, italics added.) The court was "cognizant of the fact that distinguishing representation which concerns property and representation concerning other matters will be difficult." (*Ibid.*) Nonetheless, the court was "certain that, with proper documentation by applicants, compensation may be awarded for those services which concerned the estate." (*Id.* at pp. 89–90.)

*In re Polishuk* (N.D.Okla. 2001) 258 B.R. 238, the case on which Larson primarily relies,[10] was also decided under section 327, not section 329. The debtor there filed a petition for bankruptcy on the eve of trial of his divorce action, attempting to remove it to bankruptcy court. The bankruptcy court ordered the matter remanded, and trial went ahead as scheduled. The state court divided the couple's assets and ordered the debtor to pay the wife's attorney fees. Immediately after the conclusion of the divorce trial, the bankruptcy court appointed Attorney Howard, who had represented the debtor in the trial, to be special counsel on a nunc pro tunc basis. (*In re Polishuk*, at p. 241.) The court determined at that time that employment of Howard was in the best interest of the estate under section 327. The only issue before the court in *Polishuk* was whether the applications for payment of fees submitted by Howard and another firm that had represented the debtor during the course of the bankruptcy should be approved. The issue turned on whether their work "conferred a benefit" on the estate for purposes of section 330. (*In re Polishuk* at p. 248.) Convinced that "[t]he bankruptcy case could not [have] proceed[ed] unless and until trial of the Divorce Action was completed" and that "[t]o the extent that the trial of the Divorce Action resulted in the division of property between [the debtor] and [his wife], the estate was benefited" because "[o]nly after such a property division could there be a determination as to what items of marital property were property of the estate," the court permitted Howard to recover a portion of his fees. (*Id.* at p. 250.) The court drew a line between the time spent in trial, and the time spent on other matters: "[T]he services of [the attorney] which relate to the trial of the Divorce Action, at the time they were performed, were 'necessary to the administration of the estate' for purposes of § 330(a)(3)(C). The balance of the fees sought relate to the appeal of the Divorce Decree, as well as other issues relating to child custody and visitation. Said fees are not compensable from the bankruptcy estate." (*Id.* at pp. 250–251.)

---

[10] Larson also cites *In re Powell* (N.D.Tex. 2004) 314 B.R. 567 as an example of a case in which a family lawyer was said to be acting "in connection with" a bankruptcy. In that case, the court was interpreting the language of section 330(a)(4)(B), which permits the court "[i]n a chapter 12 or chapter 13 case" to "allow reasonable compensation to the debtor's attorney for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section." The court's decision focused on the peculiarities of a chapter 13 proceeding, where control over the debtor's assets and payment to creditors can last from three to five years. The court's conclusion was based on its concern that a strict interpretation of the "in connection with" bankruptcy language in section 330(a)(4)(B) could prevent the debtor from obtaining a divorce during that period. The court further pointed out that if it did not allow the debtor to pay directly out of estate assets as an administrative expense, she would be forced to pay from her monthly income thereby "reducing her income available for plan payment through the disposable income test." (*In re Powell, supra,* at p. 570.) The holding is not particularly relevant here.

■ Although it is difficult to generalize from the disparate circumstances presented in the above authorities, it is clear that bankruptcy courts do not automatically deem counsel retained to represent a debtor in divorce proceedings to be acting "in connection with" the bankruptcy or "in the best interests" of the estate. Bankruptcy courts are understandably reluctant to conclude that divorce lawyers automatically fall under sections 327 to 330 because, notwithstanding their onerous reporting and review requirements, they confer a significant benefit: priority over other creditors. (See, e.g., *In re Polishuk, supra*, 258 B.R. at p. 240 [court noted that every dollar expended on fees to the family lawyer results in fewer funds for distribution to creditors of the estate]; *Matter of Swartout, supra*, 20 B.R. at p. 106 [court noted that "legal services for matters unrelated to the ultimate bankruptcy proceeding [such as debtor's divorce proceedings] should not be compensated as a priority expense if the services were not directly connected with the bankruptcy proceeding"].) The proponent of their applicability must, therefore, present evidence that significant property issues are at stake and that the attorneys are likely to benefit the estate by, for example, defeating competing claims of the debtor's spouse to property that should belong in the estate. Even then, large portions of the fees are likely to be found to have been incurred solely for purposes of obtaining the dissolution of the marriage as opposed to the division of property, and will not be subject to the bankruptcy provisions at issue.

In terms of our review of the order granting summary judgment, the question is whether Larson presented sufficient evidence to support what is essentially a factual contention: that ZRG&L's representation was "in connection with" the bankruptcy. As we have seen, Larson made no attempt to do this until his reply, when he pointed the court to specific provisions in the reorganization plan and the MSA that indicated a division of property took place in the dissolution proceeding, leaving Larson with the home used to fund the reorganization plan. No related facts are to be found in the SOF. As we have discussed, the trial court was free to look behind the SOF at the exhibits and other evidence, but in our view, the evidence did not resolve the question of the nature of ZRG&L's representation. Even assuming Janet was attempting to claim an interest in Larson's home, the plan and MSA could not possibly establish that 100 percent of ZRG&L's time was spent on this dispute. The above authorities make clear that distinction must be drawn between actions undertaken by divorce counsel that have an important impact on the bankruptcy and actions that pertain solely to the marital dissolution. The latter are not subject to either section 329 or section 327.

Moreover, looking behind the SOF at the exhibits themselves, one cannot avoid noting that ZRG&L was described in the reorganization plan as a "Non-Estate Professional" and, unlike Larson's bankruptcy counsel, was not included in the list of administrative claimants entitled to priority payment

out of estate assets. As we have seen, once legal representation is deemed to be "in connection with" the bankruptcy or "in the best interests" of the estate, the attorneys involved become administrative claimants entitled to priority. This description of ZRG&L in the reorganization plan executed by Larson at the very least raises factual issues concerning the firm's status. Alternatively, it might be deemed a binding admission or an appropriate subject for collateral estoppel.

█ Larson contends that the court's finding, contained in the final order prepared by his counsel, that the terms of the MSA were "incorporated into" the reorganization plan establishes the necessary connection. But the plan, in discussing the MSA, stated merely that "[t]he Debtor and [Janet] have settled their disputes pursuant to the [MSA]"; that "pursuant to a separate motion, the Debtor is seeking Court approval of the MSA which is conditioned on confirmation of the Debtor's Plan or a dismissal of the Debtor's chapter 11 case on terms and conditions acceptable to the Debtor"; and that "[a] copy of the MSA is attached hereto as Exhibit B." The plan, thus, did little more than acknowledge the existence of the dissolution proceedings and the MSA. This does not resolve the question of the connection between the two proceedings. As the party moving for summary judgment, Larson bore the burden of proving that ZRG&L's legal work was in connection with the bankruptcy, and he failed to meet it. The trial court should not have granted summary judgment on this ground.

## III

### Applicability of Section 1141

As we have discussed, this court reviews de novo the trial court's decision to grant summary judgment. This means " 'we are not bound by the trial court's stated reasons or rationales.' " (*Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805 [85 Cal.Rptr.2d 459].) In other words, "[t]he trial court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Kaneko v. Yager* (2004) 120 Cal.App.4th 970, 977 [16 Cal.Rptr.3d 183].) Indeed, in our review, "we are not concerned with the findings actually made by the trial court in support of its ruling." (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320 [7 Cal.Rptr.3d 628].)

Larson contended in his motion for summary judgment that his debt to ZRG&L was discharged under section 1141 once his reorganization plan was confirmed. ZRG&L conceded that its claim accrued preconfirmation, but

opposed this contention based on the statutory definitions of "creditor" and "order for relief." A "creditor" is defined by section 101(10)(A) as an "entity that has a claim against the debtor that arose at the time of or before *the order for relief* concerning the debtor." (Italics added.) Section 301 states that "[t]he *commencement* of a voluntary case under a chapter of this title [title 11] constitutes an order for relief under such chapter." (Italics added.) The trial court found that section 1141 was not dispositive because "ZRG&L is not necessarily and indisputably a creditor." We disagree.

As Larson points out, section 1141(d)(1), which specifically deals with the effect of confirmation of a chapter 11 reorganization plan, provides that "Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—[¶] (A) discharges the debtor from any debt that arose before the date of such confirmation . . . ." As can be seen from the plain language of the statute, the discharge accorded by this provision is not dependent on the definition of "creditor." Larson cites numerous authorities for the proposition that the discharge applies to debts that arose postpetition and preconfirmation, even though in those circumstances, the holder of the debt does not meet the technical definition of "creditor." In *Matter of Christopher* (5th Cir. 1994) 28 F.3d 512, for example, plaintiff's claims for breach of contract, unjust enrichment, tortious interference, and fraud arose from dealings that occurred while the debtor was involved in a chapter 11 proceeding. Plaintiff was aware of the pendency of the proceedings, but because the claim arose postpetition, it was not given formal notice or invited to appear. The debtor's reorganization plan was confirmed in the midst of litigation, and he sought a determination that the claim had been discharged. The court held in favor of the debtor, concluding that the discharge accorded by chapter 11 "is broader than that obtained in a Chapter 7 bankruptcy" because "while a Chapter 7 discharge deals only with debts incurred prior to the filing of the petition, § 1141(d) discharges the debtor from any debt (with certain exceptions) that arose before the date of *confirmation*." (*Matter of Christopher,* at p. 515.) To the same effect are the holdings in *In re Sure-Snap Corp.* (11th Cir. 1993) 983 F.2d 1015, 1018 (holding that "confirmation of [the debtor's] Chapter 11 plan *discharged* its *pre-confirmation* liabilities [in an ongoing] *Agreement*"); *In re Eagle-Picher Industries, Inc.* (S.D.Ohio 2002) 278 B.R. 437, 447 (stating that "in the § 1141(d) discharge, Congress provided that the discharge extended to 'any debt that arose before the date of . . . confirmation" which "contrasts with the Chapter 7 discharge which, at § 727(b), extends only to pre-petition debt"); and *In re Polysat, Inc.* (E.D.Pa. 1993) 152 B.R. 886, 891 (stating that "[s]ince section 1141(d)(1)(A)

defines the scope of the chapter 11 debtor's discharge to include 'any debt that arose before the date of such confirmation,' courts have concluded that this statutory provision should be interpreted as written").

ZRG&L cites no authority for its position that the definitions of "creditor" and "order for relief" mandate a different result for postpetition, preconfirmation debts in chapter 11 proceedings. It discusses *Roland v. UNUM Life Ins. Co. of America* (E.D.Va. 1998) 223 B.R. 499. The issue in that case, however, was whether debtors would be permitted to hire a criminal lawyer to represent the wife while chapter 11 proceedings were ongoing. They promised to use only postpetition wages to pay the attorney. The bankruptcy court issued an order forbidding the expense, but the district court reversed because the postpetition wages were not property of the estate under section 541 and the bankruptcy court had no authority to prevent the wife from using them for any purpose. Because the matter for which the debtor sought to retain criminal counsel was "simply not related to, concerning, or affecting the bankruptcy estate," it "[did] not fall within the scope of the trustee's duties and responsibilities," section 327 "does not apply, and the permission of the bankruptcy court was not required for what was essentially a matter solely confined to the [debtors] as individuals separate from the bankruptcy estate." (*Roland* at p. 506.)

Defining "property of the estate" to exclude postpetition wages has no bearing on whether a preconfirmation debt is extinguished under section 1141(d). Accordingly, we have no alternative but to conclude that section 1141(d) applies and discharged ZRG&L's claim "[e]xcept as otherwise provided in this subsection, in the plan, or in the order confirming the plan."

## IV

### Applicability of Order/Reorganization Plan

Section 1141 states that a claim can survive discharge if the debtor's plan of reorganization or the court's order expressly so provides. The bankruptcy court's order, attached as an exhibit to the moving papers, is of no help to ZRG&L. It provided that "*[a]ll holders of all claims against the Debtor* or its estate shall be bound by the Plan"; that "*all entities* shall be enjoined from asserting against the Debtor or its estate, any claims, except as provided by the Plan"; and that "[e]xcept as otherwise provided in the Plan or this Order, on and after the Effective Date, *all persons who have held, currently hold, or may hold a claim treated or provided for pursuant to the Plan* are permanently enjoined from taking [action to enforce the claim]." (Italics added.) In its statement of disputed and undisputed facts, ZRG&L agreed it was "undisputed" that the reorganization "provided for payment to

[ZRG&L] only if Larson's home sold for more than a specified minimum."[11] Moreover, its statement of disputed and undisputed facts did not acknowledge any dispute concerning the fact set forth in the SOF that "Larson's home sold for less than the amount which would allow any payment to ZRG&L." The firm's opposition to the summary judgment motion was based on its status as a Non-Estate Professional and the inapplicability of section 1141 to the postpetition debt. ZRG&L did not argue or attempt to show through additional evidence that the plan should be interpreted to require payment of Larson's debt to ZRG&L even if the specified minimum sale price was not obtained.

On appeal, for the first time, ZRG&L cites a different provision in the plan in an attempt to create a dispute as to the plan's proper interpretation. The cited provision states: "[A]s of the conclusion of [the sale of the house] the Debtor's principle [*sic*] remaining obligations will be unpaid taxes in the approximate amount of $1 million as well as certain Non-Estate Professionals [*sic*] to the extent not paid in full from the proceeds of [the sale of the house]. The Debtor believes that his Postpetition Earnings will be sufficient to satisfy these remaining obligations." ZRG&L asks us to conclude that this means the plan requires Larson to pay its outstanding fees from his postconfirmation income.

█ The appellate court can deem an argument raised in an appeal from a grant of summary judgment waived if it was not raised below and requires consideration of new factual questions. In *City of San Diego v. Rider* (1996) 47 Cal.App.4th 1473 [55 Cal.Rptr.2d 422], the city sought validation of a leaseback financing arrangement with a football team to fund improvement to San Diego's sports stadium. The parties opposing lost on summary judgment and, on appeal, argued for the first time that the ground lease was void for lack of consideration and uncertainty, and should be remanded for determination of fair market value. The court rejected that contention: "A party waives a new theory on appeal when he fails to include the underlying facts in his separate statement of facts in opposing summary judgment. [Citation.] A new theory on appeal is also waived when the new theory involves a controverted factual situation not put in issue below. [Citation.] In his separate statement filed in opposition to respondents' summary judgment motion, [appellant] conceded that consideration for the ground lease included the agency's agreement to construct the improvements required by the 1995 agreement. In opposing the motion, he never contended the ground lease was uncertain or raised the factual issue of fair rental value in either his argument

---

[11] ZRG&L objected to the portions of Larson's declaration that set forth the details of the sale, but the objections—based on lack of foundation and hearsay—were overruled. No issue was raised on appeal concerning the trial court's evidentiary ruling which, in any event, appears to have been correct.

or separate statement. The superior court was the proper forum in which to raise these issues. We deem the arguments waived." (*Id.* at p. 1493; accord, *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 983 [105 Cal.Rptr.2d 88] ["As a general rule, a new theory may not be presented for the first time on appeal unless it raises only a question of law and can be decided based on undisputed facts"].)

■ The provision cited by ZRG&L is, at best, ambiguous. It does not clearly state that ZRG&L will be paid from postpetition earnings, only that the debtor "believes" they will be "sufficient" for that purpose. Interpretation of ambiguous contractual provisions represents a question of fact, and requires the trier of fact to consider " 'facts, circumstances and conditions surrounding [the contract's] execution as well as the conduct of the parties to the contract.' " (*Rogers v. Prudential Ins. Co.* (1990) 218 Cal.App.3d 1132, 1137 [267 Cal.Rptr. 499], quoting *Walter E. Heller Western Inc. v. Tecrim Corp.* (1987) 196 Cal.App.3d 149, 158 [241 Cal.Rptr. 677].)

Moreover, if ZRG&L wished to pursue Larson under the terms of the plan, the plan should have been raised as a basis for its claims in its complaint. (See *In re Benjamin Coal Co.* (3d Cir. 1992) 978 F.2d 823, 827 ["[O]nce the reorganization plan is approved by the bankruptcy court, each claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself"]; *In re Wrenn Ins. Agency of Missouri, Inc.* (W.D.Mo. 1995) 178 B.R. 792, 796, quoting *In re Modern Steel Treating Co.* (N.D.Ill. 1991) 130 B.R. 60, 65 [" '[A] confirmed plan is a contract.' . . . Once a plan is confirmed, it is binding upon the debtor and all claimants dealt with thereunder" (citation omitted)]; *In re Astroglass Boat Co., Inc.* (M.D.Tenn. 1983) 32 B.R 538, 542 ["[T]he plan and order of confirmation fixe[s] the rights of the parties"]; *In re Montgomery Ward Holding Corp.* (D.Del. 2004) 306 B.R. 489, 494 ["Once a plan is confirmed, a creditor's rights are governed exclusively by the terms of that plan"].) "A defendant moving for summary judgment need address only the issues raised by the complaint; the plaintiff cannot bring up new, unpleaded issues in his or her opposing papers." (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 98–99, fn. 4 [93 Cal.Rptr.2d 820].) Having failed to mention the plan in its complaint and having failed to dispute Larson's interpretation of the plan as not permitting collection of the debt unless the house sold for more than $5.6 million, and having taken the position that the plan had nothing to do with its claim, ZRG&L cannot be heard to argue for the first time on appeal that the plan permits it to collect its fees from postpetition income.

## DISPOSITION

The order granting summary judgment and judgment entered thereon are affirmed.

Epstein, P. J., and Hastings, J., concurred.